540

**ENGLAR'S ESTATE v. COMMISSIONER OF INTERNAL REVENUE.**

**JONES' ESTATE v. SAME.**

**HOUSTON v. SAME.**

**BRENGLE v. SAME.**

**LACQUES v. SAME.**

Nos. 149–153, Dockets 20769–20773.

Circuit Court of Appeals, Second Circuit.
Feb. 27, 1948.

J. Joseph Noble, of New York City (Evert L. Bono, of Washington, D. C., of counsel), for petitioners.

Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key, George A. Stinson, and Irving L. Axelrad, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

During World War I, United States nationals, including various marine insurance companies issuing war risk policies, sustained losses through the destruction of ships and cargoes by enemy action. At the end of the war the German Government agreed to pay reparations to the United States Government which in turn would, so far as possible, indemnify those nationals who had sustained the losses. To that end a Mixed Claims Commission was set up through which the United States could present the claims of its nationals, the claims could be adjudicated and awards made by the representatives of the two countries. Under that arrangement the American claimants filed their claims with the State Department and the United States undertook to prove the claims, obtain the awards and pay its citizens.

While the claimants were represented before the Mixed Claims Commission only by the State Department there was much work to be done on their behalf in the preparation of the claims. Accordingly agreements were made between the law firm of Bigham, Englar, Jones & Houston and its clients for the submission of proofs to the Mixed Claims Commission.

A typical letter from the law firm to one of the marine insurance companies, under date of August 29, 1921 [Exhibit 1, Record p. 77], recited that a resolution had been unanimously passed at a meeting of underwriters on August 3, for the presentation of claims against Germany and directing the lawyers to work out a scheme of apportionment for the expenses of such presentation. The letter concluded with the following:

"Our thought is that our compensation should be contingent. When we were first retained in connection with claims of this character, shortly after the outbreak of the war, we agreed in a number of instances, to handle them for our out-of-pocket expenses and a contingent fee of fifteen percent of the amount recovered. As indicated in the enclosed memorandum, we propose to give a five percent contingent interest in the recovery to Senator Suther-

land and we should expect to retain a ten percent contingent interest for ourselves."

At a meeting of American underwriters interested in claims against Germany, at which the lawyers were represented by Mr. Englar and Mr. Houston, the procedure outlined at the previous meeting of underwriters in August 1921, relating to the expenses of preparation and proof of the claims, was dealt with and "the contingent fee of fifteen per cent. of the amount recovered, of which five per cent. is for Washington counsel and ten per cent. for Messrs. Bigham, Englar & Jones," was reaffirmed and the latter counsel were asked to prepare a memorandum of the proceeding for distribution of sums recovered. This plan was approved by the various underwriters in a typewritten memorandum appearing in the record as Exhibit 4, under date of August 6, 1924.

Under their retainers petitioners' firm performed professional services, including the preparation and filing of particulars of the claims with the United States Department of State, studying the history and legal precedents for adjudication by the Mixed Claims Commission, and supplying the United States representatives and other officials with such assistance and information as they required for the conduct of the hearings before the Commission. As a result of these efforts the Mixed Claims Commission, in September, 1924, made awards of damages to petitioners' clients. Prior to the end of the year 1931, about forty of these clients—each of whose awards was less than $100,000—had been paid in full, totalling approximately $4,000,000. The remaining clients, about thirty in number —each of whose awards was in excess of $100,000—received partial payments totalling approximately $21,000,000. The petitioners' firm received as fees fifteen per cent of those payments.·

Payments made prior to the end of 1931 to American claimants with proven claims exhausted all assets then available for the payment of awards of the Commission except that a reserve fund had been established for possible awards on claims which had not yet been finally adjudicated. In 1932 the German Government ceased making payments on account of reparations. Thereafter, petitioners' firm engaged in negotiations with representatives of the United States and the German Governments to secure further payments on the awards made in 1924, which negotiations required three separate trips to Germany. Their firm successfully opposed a plan whereby holders of unproven claims would have received payment from this reserve fund without requiring such holders to produce further proof that the damages were caused by German action. The payment of the "unproven" claims from the reserve fund would have left no further funds for application to the unpaid claims of the petitioners' clients. The negotiations resulted in payments in 1941 from this reserve fund to petitioners' thirty partially paid clients. Upon these payments the petitioners' firm received on account of its commissions of fifteen percent the amount of $157,663.75. This sum included a $10,000 fee from.a client obtained subsequent to 1931 who is not involved in the present appeal. The foregoing additional payments received in 1941 were far less than seventy-five per cent of the aggregate paid them by the thirty clients under their retainers for services performed prior to and after 1932.

In determining each petitioner's 1941 income tax liability the Commissioner of Internal Revenue included as income taxable at the 1941 rates, the amount of each petitioner's share of the fees received in that year and the Tax Court reached the same conclusion. On appeal from the latter court the question presented to us is whether each share of income derived from the recoveries on war claims in the year 1941 should be taxed fully as income for that year, or should, as taxpayers contend, be apportioned under the provisions of Section 107 of the Internal Revenue Code as amended by Section 139 of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Acts, page 207. These statutory provisions are set forth in the margin.[1]

---

[1] "§ 139. Compensation for Services Rendered for a Period of Thirty-Six Months or More.

"(a) Section 107 is amended to read as follows:

" 'Sec. 107. Compensation for services

The taxpayers claim the benefits of Section 107 on the ground that their firm performed two separate and distinct services for their clients in connection with war claims: (1) for the years prior to 1932, when they were engaged in preparing and assembling data and documents on which the claims were originally presented to the Mixed Claims Commission, and in facilitating arrangements so that the awards made in 1924 could be realized; (2) for the years 1932 to 1941, when they were engaged in working to procure additional funds for the payment of the balance of the awards.

The facts in the case do not support these contentions. All the fees in question were earned under the original contingent fee retainers as the testimony of the petitioner, Paul H. Lacques, clearly shows [Appendix, p. 69]. The services prior to 1932 resulted in the awards by the Commission and in the original part payments upon the thirty claims. Without these services neither the awards nor any of the payments would have followed. While the payments in 1941 were based upon services subsequent as well as prior to 1932, it is manifest that they would not have been secured without the earlier services. According to the testimony of Paul H. Lacques, the member of the firm specially engaged in the later services, the perfection of the claims in the earlier years and the securing of the judgments of the Commission were necessary in order that the later payments might be realized [Appendix, p. 68]. Each amount received by the members of the firm was the result of a single contract for the reason that it was contingent on a payment upon the claim after the performance of whatever services were requisite to earn it. This is not merely because the arrangement was evidenced by a single contract but because that contract covered services, all of which were necessary to obtain the payments upon which the commissions were based.

We see no difference in principle between the facts in the case at bar and those in Smart v. Commissioner of Internal Revenue, 2 Cir., 152 F.2d 333, certiorari denied 327 U.S. 804, 66 S.Ct. 962, 90 L.Ed. 1028; Spears v. Commissioner of Internal Revenue, 7 T.C. 1271, affirmed Per Curiam, 3 Cir., 164 F.2d 486. In our view there can be no distinction so far as the application of Section 107 is concerned between the services rendered before or after the year 1932.

The decisions of the Tax Court are accordingly affirmed.

---

rendered for a period of thirty-six months or more.

" '(a) Personal Services. If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of . such individual ratably over that part of the period which precedes the date of such receipt or accrual.'

\* \* \* \* \*

"(b) The amendment made by subsection (a) shall be applicable to taxable years beginning after December 31, 1940, but with respect to a taxable year beginning after December 31, 1940, and not beginning after December 31, 1941, the period specified in such subsection shall be sixty months in lieu of thirty-six months, and the percentage specified in such subsection shall be 75 per centum in lieu of 80 per centum."