GEORGE E. REYNOLDS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF MILDRED D. REYNOLDS, DECEASED, GEORGE E. REYNOLDS, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 39399, 39421. Filed September 28, 1956.

*Stanley Suydam, Esq.*, and *H. Stewart McDonald, Esq.*, for the petitioners.

*George J. Rabil, Esq.*, for the respondent.

1228

1234

OPINION.

TURNER, *Judge:* It is the position of the petitioner that of the payments received by him in 1942 from Marmon-Herrington Company, Inc., $55,536 was his compensation for services rendered in the sale of the 240 tanks; that the services for which the said amount was received covered a period of at least 37 months, from August 1939 through August 1942, and that his tax thereon is to be computed under section 107 (a) of the Internal Revenue Code of 1939.[5]   He concedes that

[5] SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

(a) PERSONAL SERVICES.—If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.

$55,536 did not constitute 80 per cent of his total compensation received from Marmon for personal services rendered during the required period under his contract of employment with that company, but takes the position that, for the purposes of section 107 (a), the services rendered in making the sale of the said tanks and his commissions in respect thereof are to be treated separately from all other services rendered to Marmon and all other compensation received from Marmon for the same period. In short, his position would appear to be that each individual and separate sale, or at least the sales to a single customer, must be regarded as a separate service or employment, for the purposes of section 107 (a), even though they constituted only a part of the services he was obligated to perform and did perform under the contract and even though all sales to all customers during the same period, plus all of his work looking to sales where sales did not in fact materialize, were actually services performed under one and the same employment.

Our first difficulty is one of fact, since we have been unable to find any adequate basis in the proof for the conclusion that petitioner ever received $55,536, or any amount approaching that sum, for the services rendered by him in the sale of the 240 tanks. In fact, the only compensation ever paid with direct, separate, or specific reference to the sale of the said tanks was the $4,628 received on May 12, 1942, and, so far as appears, that may have been the entire amount which did or could have become payable to petitioner in 1942 under the current contract of employment.

Under the contract, and according to its interpretation by the parties thereto, commissions on sales were earned and payable when the items sold had been delivered and Marmon had been paid in full. Until then there was no liability on the part of Marmon for commissions, and it was Marmon's practice to pay commissions at the end of the month in which the stated conditions had become satisfied. The $4,628 paid on May 12, 1942, is shown on Marmon's books as relating to 20 tanks, and in light of the above, we may presume that by May 12, 1942, 20 of the tanks had been delivered and Marmon had been paid in full therefor. As to the remaining tanks, however, we only know that the last of them were not delivered until 1944. We are not advised as to when Marmon was paid in full for these tanks. There is accordingly no basis for concluding that Marmon ever did become liable under its contract with petitioner for commissions, as such, on the 240 tanks over and beyond the payment of $4,628 on May 12, since no other payments were ever made with separate and specific reference to the said tanks.

It is of course true that by entries in March, April, May, June, and July 1942, Marmon did accrue on its books the entire $55,536, but, even so, we are unable to conclude that the entries were indicative of

anything more than potential or prospective liability, it being the testimony of one of Marmon's officials that it regularly made payment of all commissions owing by the end of the month in which the goods had been delivered and it had been paid in full. It is also noted that the official having charge of Marmon's books and records, when questioned about the matter, was unable to explain the accruals on the books in excess of the $4,628. He was not in charge of the books at the time the entries were made, and the individual who had been in charge was not available to testify.

It is undoubtedly true that the services which had been rendered by petitioner and his claims, prospective or otherwise, for commissions on the remaining 220 tanks were taken into account in arriving at the $75,000 paid by Marmon to petitioner on August 31, 1942, in satisfaction of all "commissions and compensation," due or thereafter to become due under the contract of January 1, 1940. By the agreement, however, all claims both present and prospective were lumped together and without any evaluation of any of the claims separately but only with reference to the whole, the lump-sum settlement of $75,000 was agreed upon and payment thereof was made. It could be that the other claims weighed as strong or stronger than petitioner's claims for the balance of the commissions on the 240 tanks. It could be that they did not.

Neither do we regard the entries made on Marmon's books indicating that a sufficient portion of the $75,000 lump-sum settlement was entered to balance the entries which had previously been made in the guise of accruals of commissions on the 240 tanks as proof that petitioner had earned and Marmon was paying for his services in connection with the sale of the 240 tanks the full $55,536. For whatever purpose the entries had been made, and since petitioner's rights to further commissions, potential or otherwise, on the tanks had now been covered and satisfied by the lump-sum settlement and payment, the clearing of the prior entries by the application of a portion of the $75,000 was a matter-of-course bookkeeping operation.

Assuming, therefore, that petitioner's interpretation of section 107 (a) is sound, we would be left without adequate proof as to the amount, if any, to which the provisions of that section are to be applied, over and above the $4,628 paid on May 12, 1942.

At this point, it may be observed that the lump-sum settlement made by the parties as of August 31, 1942, would tend to refute rather than support petitioner's contention that his services rendered in connection with the sale of the 240 tanks should be regarded as separate and apart from all other services for which he was employed under his various contracts.

But even if it be assumed that petitioner did in fact receive $55,536 in 1942 as compensation for his services in connection with the sale of the 240 tanks, section 107 (a) is not, in our opinion, susceptible of the interpretation and application contended for. The facts show that petitioner was employed generally as Marmon's Washington sales representative and that his employment with respect to the sale of the said tanks and the services rendered with reference to the sale were not separate or separable from his general employment as Marmon's Washington sales representative. He was to receive for his services as such salesman a fixed salary of $200 per month, plus specified commissions where. his efforts in performance of those services resulted in actual sales. The fact that such added compensation was to be realized only where the sales efforts did result in a sale and his compensation in part was to be computed with specific reference to individual sales, does not make or cause the employment contract to. be a series of individual or separable contracts, or the services to be rendered on the sale of one item or group of items divisible, for the purposes of section 107, from the sales services for which he was generally employed.

The facts being as they are, the instant case, in our opinion, is not distinguishable in principle from *Harry Boverman*, 10 T. C. 476, and *J. Mackay Spears*, 7 T. C. 1271, affd. 164 F. 2d 486. The construction and application of section 107 (a) for which petitioner contends is accordingly rejected. See also *W. Harold Warren*, 20 T. C. 379; *Rosalyne A. Lesser*, 17 T. C. 1479; and *Harry Civiletti*, 3 T. C. 1274.

In addition to representing Marmon, petitioner, from the middle 1930's, had represented several other manufacturing firms in Washington. Mildred assisted petitioner in the conduct of his business as sales representative practically from the start. On March 1, 1942, petitioner and Mildred entered into a partnership agreement, whereby Mildred was to have a proprietary interest in one-third of the profits and losses of the business and petitioner was to have a two-thirds interest. On September 1, 1942, this partnership agreement was amended to provide that petitioner and Mildred should each share in the partnership business equally, one-half interest to each.

It is the respondent's contention that Mildred's assistance to petitioner in the running of the purported partnership was only superficial and no more than any wife would do to help her husband in a like situation; he further contends that other evidence of record militates against a holding that there was a valid partnership between petitioner and Mildred. The evidence, we think, refutes the contention so made and, to the contrary, the record as a whole indicates that the partnership was entered into in good faith and with a business purpose and the services contributed by each were of such value to the partnership as to

warrant participation in the profits. *Commissioner* v. *Culbertson,* 337 U. S. 733.

Mildred had worked periodically at petitioner's office for several years prior to the 1942 agreement. She was acquainted with petitioner's employers, and was familiar with the products they produced, as well as being acquainted with his customers and business contacts in the Washington area. The business in which petitioner was engaged prior to the partnership and in which the partnership continued, while essentially concerned with the sale of products, was at the same time required to undertake a great many collateral services specifically connected with the particular contracts of sale. The commission on each sale was the only compensation received therefor and, thus, necessarily covered remuneration for all these collateral services rendered by petitioner, as well as the actual closing of the sale itself. It appears that such services were in many instances more onerous than the making of the sale. In part, the collateral services consisted of such tasks as procuring priorities on components necessary to manufacture and complete contracts, acquiring certificates of necessity for plant expansion, to handle the increased wartime production, and other work with the various Federal Government agencies. Such work required not only a great deal of time and patience in the city that was gearing the nation as a whole for total war, but required, as well, a know-how not only of the governmental processes but of the products with which the partnership was dealing. For petitioner to have attempted to handle these collateral services himself would obviously have curtailed the amount of time he had to devote to the actual procuring of sales. It was under such conditions that petitioner agreed to join in a partnership with Mildred. With Mildred to run the office and handle those collateral but necessary services required by the sales contracts, as well as to assist with actual sales, petitioner was free to devote a great deal more time to the actual selling, thus greatly increasing their income. We think the record is convincing with respect to Mildred's capabilities for her duties to the partnership, as well as her actual performance of those duties.

It is true, as respondent points out, that the record contains evidence, the natural inference of which could, were the over-all circumstances otherwise, cast doubt on the bona fides of the partnership; namely, the failure to open a separate bank account, the commingling of the partnership funds with petitioner's personal funds in his personal account, the erroneous listing by Mildred of her share of the partnership profits on her individual income tax return for 1942 as compensation for services rather than partnership income, and the business of the partnership not being listed under the partnership name in the telephone directory, but rather, retaining the listings under petitioner's

name and the names of the various companies he represented. We think, that taken with the other evidence of record, such evidence may indicate carelessness, but it does not, in our opinion, negative or overcome the evidence that a partnership as claimed was created and did exist. See *Estate of Frederick A. Depue*, 13 T. C. 463. Petitioner's contention with respect to this issue is sustained.

Our final question is whether the loss on the operations of the citrus groves for the period ended December 31, 1942, was the deductible loss of George alone, or that of both George and Mildred.

After Mildred had found the first of the two groves, presumably in early June 1942, and the initial steps for its purchase had been taken, she proposed that they own and operate it as partners. They sought the advice of their lawyer and he drew up a partnership agreement which, under date of June 15, 1942, they executed. The business of the partnership was to consist of the "owning and operating of citrus groves in the State of Florida or elsewhere," and it was provided that the "aforesaid citrus groves * * * owned by the parties" were thereby made partnership property, "each of the partners contributing the same in equal proportions." At home that night, according to the testimony of petitioner, they had some discussion and concluded that Mildred would not be in a position to contribute her share of the purchase price of the groves until the year-end closing of the George E. Reynolds & Company books, and until that occurred, they figured that the partnership could or would not be effective.[6] Without consulting counsel further, they themselves drew up a second agreement which they executed under date of June 16, 1942, to the effect that the beginning date of the partnership should not be until January 1, 1943.

Thereafter, on July 1, 1942, they acquired Magnolia Groves, consisting of 37 acres, and on July 8, Mixon Grove, approximately one-half mile distant and consisting of 10 acres. In each instance, they became owners of the property as tenants by the entirety, part of the purchase price being paid in cash, with payment of the balance secured by a mortgage. They employed a manager to supervise and conduct the operations of the groves and from time to time both George and Mildred transmitted money to him to cover the cost of operations. Such records of their disbursements in the purchase of the groves, of the interest payments under the mortgages, and of their transmittals for expenses of operations as were kept, were kept by Mildred.

---

[6] At June 30, 1942, $6,564.22 had been credited to Mildred on the books of the George E. Reynolds & Company as her distributive share of the profits for March, April, May, and June. Similar credits of $1,062.23, $4,281.70, $5,554.42, $18,473.36, $3,505.92, and $8,536.97 were made at the end of the months July, August, September, October, November, and December respectively, bringing the total amount credited as Mildred's share of the profits for 1942 to $42,976.66. The funds of the George E. Reynolds & Company were carried in petitioner's individual bank account.

From the Schedule of Farm Income and Expense, Form 1040F, attached to petitioner's income tax return for 1942, it appears that the entire operation through December 1942 was limited to the cultivation, care, and maintenance of the groves and the care and maintenance of equipment. There were no sales and no gross income and there is no indication that any sales for the said period had been anticipated. They did have substantial fruit sales for the following year, gross sales of fruit being reported in their 1943 partnership return as $16,673.24.

The position of the petitioners, as we understand it, is that George alone put up the cash for the downpayments on the groves, that it was thought that he would be required to supply the operating funds through December,[7] and since, for those reasons, they had by the agreement dated June 16, 1942, postponed the beginning of the partnership until January 1, 1943, the operation up to January 1 was that of George alone and the loss sustained his loss.

Assuming that an effective arrangement could be made whereby one spouse could grant to the second spouse, free of charge, the use of property belonging to the first, to the end that the operation would be that of the second and the gains or losses those of such second spouse, we do not have that situation here. At the most, there was nothing more than an abortive partnership prior to January 1, 1943. The date on which the partnership was to come into being had already been postponed to January 1, some 2 to 3, weeks before the properties which were to have been owned and operated by the partnership were actually acquired, and when the properties were acquired they were acquired by and became the property of the petitioners not as partners but as tenants by the entirety. Our question accordingly is as to the deductibility of a loss from the operation of the properties owned by a husband and wife as tenants by the entirety.

Under Florida law, it appears well settled that the income from the operation or the proceeds of sale of real estate held by a husband and wife as tenants by the entirety is equally the property of the husband and wife. *Dodson* v. *National Title Insurance Co.*, 159 Fla. 371, 31 So. 2d 402; *Ohio Butterine Co.* v. *Hargrave*, 79 Fla. 458, 84 So. 376; and *English* v. *English*, 66 Fla. 427, 63 So. 822. And this is so, even though the purchase of the property was made with funds of the husband alone. *Kollar* v. *Kollar*, 155 Fla. 705, 21 So. 2d 356, and *Strauss* v. *Strauss*, 148 Fla. 23, 3 So. 2d 727.

It is also settled, we think, that where the State law with respect to property owned by a husband and wife as tenants by the entirety is

---

[7] There is no proposed finding by petitioners and in their briefs we have been unable to find any definite claim or contention that George from his separate and individual funds did in fact supply all of the money expended in the operation of the citrus groves through December 31, 1942.

as stated, that the income therefrom is, for Federal income tax purposes, that of the spouses equally. *Commissioner* v. *Hart*, 76 F. 2d 864; *Paul G. Greene*, 7 T. C. 142; and *Herman Gessner*, 32 B. T. A. 1258. And correspondingly, an operating loss on property similarly held by a husband and wife as tenants by the entirety is likewise the loss of the spouses equally, deductible one-half by the husband and one-half by the wife in their Federal income tax returns. *Oren C. White*, 18 T. C. 385. In the *White* case the property in question was a farm which had been purchased with the separate funds of the husband who, as in this case, was claiming the right to deduct the entire loss, and it is also to be noted that in that case he had paid all of the expenses of operation.

The petitioners at no place have taken issue with the soundness of the decisions cited. In fact, the only reference thereto was in their reply brief, to the effect that the respondent had cited "certain Florida cases on the subject of tenancies by the entirety." Furthermore, the established facts here are not nearly as indicative of an individual operation by the husband, as in the *White* case above. George did testify that he alone had furnished the cash for the downpayments on the two groves, and the supplemental agreement did suggest that he would be required to contribute all of the funds needed during the remaining part of 1942. The record indicates, however, that at the time the downpayments on the purchase prices were made a fairly substantial amount of money belonging to Mildred was in George's individual bank account. It also appears that the balances of the purchase price payments were secured by mortgages on the properties themselves, in which case Mildred, as well as George, was obligated therefor. With respect to the actual operation of the properties, Mildred, if anything, was more active than George. They both transmitted expense money to the manager, and we have been unable to find any definite proof that George did in fact supply the money from his separate funds. It also appears that Mildred's share of the George E. Reynolds & Company profits, carried in George's bank account, grew substantially month by month and long before the end of 1942 much more than her share of the purchase money was actually subject to George's command, regardless of the date of any formal settlement between them.

On the record before us, it may not properly be said that the respondent erred in his determination that the loss on the operations of the Florida citrus groves for the period ended December 31, 1942, was the loss of the petitioners jointly. The contention that the loss was that of George alone is accordingly rejected.

*Decisions will be entered under Rule 50.*