R. O. Shaffer and Mildred M. Shaffer, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 53993. Filed November 7, 1957.

*Whitfield J. Collins, Esq.*, for the petitioners.
*James F. Hoge, Jr., Esq.*, and *James Q. Smith, Esq.*, for the respondent.

Fisher, *Judge:* Respondent determined a deficiency of $4,362.56 in petitioners' income tax for the calendar year 1951. The deficiency is based upon respondent's determination that petitioners are not entitled to avail themselves of the provisions of section 107 (a), I. R. C. 1939, with respect to a portion of the amounts received by Ray O. Shaffer in 1951 as trustee of Texasteel Manufacturing Company, a debtor. The sole question for our decision is whether or not

$26,500 received by Shaffer in 1951 is separable from other fees received by him for services as trustee of Texasteel Manufacturing Company, so that the 80 per cent requirement of section 107 (a) is met.

FINDINGS OF FACT.

Petitioners are husband and wife, and during the taxable year in question resided at Fort Worth, Texas. They filed a joint return for the calendar year 1951 with the collector of internal revenue for the second district of Texas.

In 1944, proceedings in corporate reorganization of Texasteel Manufacturing Company, a debtor, were instituted in the United States District Court for the Northern District of Texas. On August 21, 1944, J. Mac Thompson was appointed trustee of the estate of the company, his order of appointment stating that he had "full power and jurisdiction over the debtor and its property wherever located and he shall have and exercise such powers as are necessary to conduct and operate the business of the debtor generally * * *."

At the time proceedings were begun, the company operated two plants—one in Port Arthur, Texas, and the other in Fort Worth, Texas. The Port Arthur plant had been built by the Government during World War II on land belonging to the company, the Government taking an option to purchase the land from the company. The Port Arthur plant operated under contracts from Navy ordnance, and the Forth Worth plant operated under contracts from Army ordnance. The operations of the Port Arthur plant resulted in a loss of several million dollars, including the loss of substantial investments of stockholders as well as all of the profits realized from the Fort Worth plant.

The two plants continued in operation after Thompson became trustee, the Port Arthur plant being run by a Navy-dominated management committee, and the Forth Worth plant being operated by the company. Thompson did not interfere with the arrangement.

By 1946, the Army contracts had run out, and the Navy had canceled its remaining contracts with the company. Thompson, as trustee, was preparing to liquidate the company by selling the Fort Worth plant to one of the principal creditors and by selling the land on which the Port Arthur plant was operated to the Government for $35,000, which amount represented the company's original investment in the land. With the proceeds, Thompson intended to satisfy whatever creditors he could, but not all of the creditors and stockholders could have been satisfied. Thompson offered the Port Arthur land to the Government for $35,000, but the Government declined the offer.

The creditors were dissatisfied with Thompson's plan and prevailed upon petitioner, R. O. Shaffer (hereinafter referred to as petitioner), who had considerable experience in the steel fabricating and related business as a plant operator, to accept an appointment as trustee of the company. (Thompson had no experience as a plant manager.) It was contemplated that the Port Arthur plant would remain idle, but that petitioner would actively manage the Fort Worth plant and reconvert it to peacetime use. The discussions and intentions of all parties concerned related to petitioner's taking over active management of the Fort Worth property, moving his office into the plant, and directing the conversion of the plant from war to peacetime products. It was not contemplated that the Port Arthur plant would be reopened, but that petitioner would perform the routine liquidation of that property.

On July 6, 1946, Thompson submitted his resignation as trustee of the company, reciting in his application for discharge that the operation and affairs of the Port Arthur Division of the company had been concluded and that "a plan of operation for the Fort Worth Division has been developed which involves the management of the Fort Worth plant by Mr. Ray Shaffer; that your Trustee, J. Mac Thompson, and his Attorney, Raymond E. Buck, desire to resign in order that Mr. Shaffer may be appointed Trustee * * *."

Thompson's application for discharge was granted and on July 16, 1946, petitioner was appointed trustee of the estate of the company. His interim compensation was fixed at $1,000 per month. It was understood that if the operation of the Fort Worth plant proved so successful that all of the debts could be paid out of the profits, Shaffer's compensation would be increased. Petitioner handled the property of the company in his capacity as trustee and by authority of his original order of appointment from the time of his appointment until the estate of the company was closed, in 1955. In the order appointing petitioner trustee, the court stated that he "shall have, and he is hereby granted, all of the powers and rights heretofore granted to and conferred upon J. Mac Thompson as trustee, and all powers as granted by law to a trustee in such proceedings. * * *."

Shortly after entering on his duties, on or about August 1, 1946, petitioner received, through another company with which he was associated, an advertisement from the War Assets Administration to the effect that War Assets was planning to sell the Port Arthur plant, including the land. Petitioner knew that Texasteel had some interest in the property, and after investigation, discovered that the option in favor of the Government to purchase the property had run without the Government exercising it. Petitioner, through his attorney, then gave notice to the Navy to remove its facilities and

restore the land to its original condition. After much litigation and negotiations between petitioner and his attorney on the one hand, and the Government on the other—which included obtaining an injunction against the proposed sale by the War Assets Administration, defeating the Navy's attempt to condemn the property, obtaining a judgment recognizing the company's title to the property and ordering restoration of the land to its original condition, and obtaining contempt citations against the Secretary of the Treasury and the head of the War Assets Administration—a settlement was worked out, in October 1947, whereby petitioner, as trustee for Texasteel, obtained full title to the Port Arthur property and the facilities thereon, in return for the company giving up certain claims which it had against the Government. Certain other claims against the Navy Department involving the operation of the Port Arthur plant were prosecuted by petitioner and his attorney in the Court of Claims.

Petitioner was not a lawyer. He personally participated in the litigation and in the negotiations leading to settlement of the controversy with the Government in his capacity as trustee. His efforts involved numerous trips to Port Arthur and Beaumont, Texas, and to Washington, D. C., where most of the negotiations took place. Petitioner's naval background was most helpful in the negotiations and his services in effecting the settlement were very valuable. Petitioner used his attorney's office in connection with the affairs of the Porth Arthur property. He used the plant office in connection with the management of the Fort Worth properties.

After petitioner obtained title to the Port Arthur property, he personally contacted prospective buyers as well as real estate agents in the area. After 3 years of negotiation with approximately 20 prospective buyers, the property was sold for $247,000 in October 1950, and the court approved the sale on October 24, 1950. The sale was not made through a real estate broker and the company received the entire proceeds of sale. The property was sold to George Armstrong, Sr., the chief stockholder of debtor company. The Fort Worth plant was sold on January 18, 1951, to the Texasteel Company for $480,000. The amount received from sale of the plants enabled petitioner, as trustee, to pay off all nonstockholder creditors of the company, a bank loan of some $450,000, and part of the obligations to stockholder creditors.

From July 16, 1946, the date of petitioner's appointment as trustee, until December 31, 1948, petitioner spent the major portion of his time managing the Fort Worth plant. In the latter part of 1948, it appeared to petitioner that the services of a full-time executive were no longer needed to manage the Fort Worth plant. Petitioner thereupon delegated the management to a plant manager, sold the office head-

quarters, and began devoting his time to other interests. As a result, petitioner limited his claim for compensation as plant manager to $29,500, representing $1,000 per month for 29½ months, although he acted as trustee of the property until it was sold.

The services rendered by petitioner pertaining to the litigation and negotiations with the United States and the consequent sale of Port Arthur property covered a period of more than 36 months.

Prior to the year 1951, petitioner had received $15,000 as part payment of the $29,500 due him for his services pertaining to the management of the Fort Worth plant. He received the remaining $14,500 in August 1951. Also in August 1951, petitioner paid himself $25,500 as part payment of $26,500 in fees due him for his services pertaining to the Port Arthur property.

Petitioner filed with the court a report and application requesting approval and confirmation of the $29,500 fee and the $26,500 fee, and requesting an order directing the payment of an additional $1,000 as part of the fee for services pertaining to the Port Arthur property. The application went into great detail as to the services rendered the company because, if it was to be approved without contest, it had to be assented to by George Armstrong, Sr., the dominant stockholder of the company who was confined to his home in Mississippi. The application divided the fees for services done with respect to each of the plants. No thought was given to the tax consequences involved in dividing the fee, either by petitioner or his attorney, the only purpose being to justify the fees to Armstrong.

On October 30, 1951, the referee and special master entered an order, subsequently approved by the District Court, approving the fees "in the amount of $29,500 for services rendered by him in the capacity of business head and manager of the Manufacturing business of the Debtor, conducted in its Fort Worth plant" and in the amount of $26,500 for "extraordinary services as Trustee, separate and apart from his service as Manager of the Manufacturing business of the Debtor, which extraordinary services as Trustee pertain to various controversies and litigation with the United States." The order also directed the payment of $1,000 still due to petitioner on the $26,500 fee. One hundred per cent of the fee for services pertaining to the Port Arthur property was received by petitioner in 1951.

The reorganization proceeding of the company continued until October 1955, when the claims against the Navy Department were adjudicated in the Court of Claims, the company recovering $3,544.71. Petitioner received no additional compensation for his services as trustee after October 1951, until the estate was closed, at which time he received a small sum as a final fee.

The $26,500 fee received by petitioner for services pertaining to the Port Arthur property was apportioned by petitioner on his 1951 income tax return over the years in which the services were rendered, as follows:

| | |
|---|---|
| 1946 | $2, 204. 37 |
| 1947 | 5, 290. 48 |
| 1948 | 5, 290. 47 |
| 1949 | 5, 290. 48 |
| 1950 | 5, 290. 47 |
| 1951 | 3, 133. 72 |

Less than 80 per cent of the total compensation for petitioner's personal services as trustee in proceedings in corporate reorganization of Texasteel Manufacturing Company covering more than 36 calendar months was received or accrued by petitioner in the calendar year 1951.

OPINION.

Section 107 (a), I. R. C. 1939, in effect, allows a taxpayer to spread back compensation received in 1 year over the years in which the services for which compensation was paid were rendered, "[i]f at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received * * * in one taxable year by an individual * * *." The parties agree that of the total compensation received by petitioner as trustee, only 73 per cent was received in 1951. The question for our decision is whether the services rendered by petitioner may be broken up for purposes of section 107 (a), so that the $26,500 received in 1951 for services in connection with the Port Arthur property may be considered 100 per cent "of the total compensation for personal services covering a period of thirty-six calendar months or more * * *." Sec. 107 (a).

Respondent argues that the services were all performed in petitioner's capacity as trustee under one appointment, and that "the total compensation for personal services" is the total amount received for services rendered as trustee under that appointment. Petitioner takes the position that although he was a single trustee appointed by a single order of the District Court, his services in relation to the Port Arthur plant—which, he states, included the negotiations and litigation entered into in connection with the Port Arthur property, and the ultimate sale of that property—were separate and distinct from his services in relation to the Fort Worth plant. He maintains, therefore, that section 107 (a) applies separately to the compensation for the Port Arthur plant services, and that the compensation received in connection with the services in relation to the Fort Worth

plant are not to be taken into consideration in determining the applicability of the statute.

We believe that petitioner's argument must fail for the following reasons: (1) The test of divisibility of services is whether the services were rendered in two distinct capacities and paid for in two distinct capacities. Since petitioner's services were rendered in his capacity as trustee under one appointment, the "total compensation for personal services" in petitioner's case is the total amount paid him in his capacity as trustee. (2) To hold for petitioner in the instant case would establish principles which would result in an impractical application of section 107 (a) in the usual case involving trustees in bankruptcy or reorganization.

While it is accepted that "the principal criterion to be applied in cases such as this is the divisibility of the personal services rendered * * *," *George J. Hoffmann, Jr.*, 11 T. C. 1057, 1062 (1948), the great majority of cases use as a test of the divisibility of services the divisibility of the capacity or employment in which the services are rendered. In the case of *Harry Civiletti*, 3 T. C. 1274, affd. 152 F. 2d 332 (C. A. 2, 1945), certiorari denied 327 U. S. 804, the Court's conclusion was stated as follows (at 1276):

There is one appointment, one trust, one employment. The services required of a trustee often consist of a variety of acts and functions, but his trust does not thereby fall apart into so many disconnected pieces, each separate from all the others, and separately compensable. * * *

The principle thus laid down has been applied to a variety of fact situations in which the taxpayer has attempted to divide the compensation received for services rendered in a single capacity on the grounds that the services for which compensation was received were in fact divisible. See *George E. Reynolds*, 26 T. C. 1225 (1956); *W. Harold Warren*, 20 T. C. 378 (1953); *Rosalyne A. Lesser*, 17 T. C. 1479 (1952); *Alfred J. Loew*, 17 T. C. 1347 (1952), affd. per curiam 201 F. 2d 368 (C. A. 2, 1953); *Ralph E. Lum*, 12 T. C. 375 (1949); *J. Mackay Spears*, 7 T. C. 1271; *Paul H. Smart*, 4 T. C. 846, affd. 152 F. 2d 333 (C. A. 2, 1945), certiorari denied 327 U. S. 804; *Cowan v. Henslee*, 180 F. 2d 73 (C. A. 6, 1950); *Englar's Estate*, 166 F. 2d 540 (C. A. 2, 1948), affirming a Memorandum Opinion of this Court dated June 20, 1947. The principle is likewise applicable where the attempt is made to combine the compensation received for services rendered in two different capacities. *Leon R. Jillson*, 22 T. C. 1101 (1954); *Gordon S. Wayman*, 14 T. C. 1267 (1950).

Petitioner was not a lawyer, and all services rendered by him were rendered in his capacity as trustee. The "total compensation for personal services" is, therefore, the total amount received by petitioner for services rendered as trustee, and since less than 80 per cent

of that compensation was received in 1951, petitioner cannot avail himself of the provisions of section 107 (a) to spread back the $26,500 received in that year. As the Court of Appeals said in *Cowan* v. *Henslee*, *supra* at 74:

The additional compensation was granted to the taxpayers, in the words of their petitions, for services "as Trustees," and not for a separate and distinct employment. The services rendered for which the additional compensation was awarded fall within the broad powers given the trustees in the plan and agreement adopted December 21, 1933. ' Since the services were not separable, the compensation received under the court decree was rightly computed as being less than 80% of the total received * * *

Here, too, petitioner received compensation only in his capacity as trustee. The services rendered were within the powers of petitioner's appointment. We may, and do, conclude therefrom, as did the court in *Cowan* v. *Henslee*, *supra*, that the services were not divisible for the purposes of section 107 (a).

We note that our conclusion is not only consonant with the decided cases, but is the only conclusion to be reached if section 107 (a) is to be applied in a practical way to the usual case involving trustees in receivership, bankruptcy, or reorganization. Obviously, section 107 (a) does not grant an option to a trustee to separate his compensation or to treat all of it as indivisible in accordance with his own choice. If the statute contemplates separating compensation per project, it must be separated in all instances where the projects are severable. The practical result of petitioner's view would be to require a separate determination of compensation for each separate activity of the trustee whenever applicability *vel non* of section 107 (a) was in issue. We do not think this is a feasible approach, or that it is contemplated by the statute. In most instances, the services of a trustee in reorganization are manifold and spread over a substantial period of time. General considerations such as over-all results are factors in determining compensation. Some separate activities may extend for less than 3 years; others for longer. The total services of the trustee may extend for more than 3 years, even though no single or separate activity may extend for that period. We think the fundamental purpose of section 107 (a) is such that it should be deemed applicable or inapplicable only after taking into consideration the total services and the total compensation of a single trustee acting continuously as such under a single appointment.

If petitioner's view is to be adopted, the principle behind it must be consistently followed, and many trustees serving as such for more than 3 years, who receive lump-sum compensation, will fail to qualify for relief under section 107 (a). Moreover, many trustees might find it at least impracticable to meet the burden of proving the period of time or the amount of compensation to be allocated to each separate

activity. The instant case illustrates the problem to some extent. Let us assume, *arguendo*, that for the purposes of section 107 (a), petitioner's activities in relation to the Port Arthur plant are severable from those involving the Fort Worth plant. That in itself would not be decisive of the instant case. It would still be necessary for us to inquire, with respect to the Port Arthur activities, as to whether the legal and accounting difficulties relating to the settlement of contracts with the Navy Bureau of Ordnance, the claim against the Bureau of Ordnance based on allegations showing wrongful acts committed by the Bureau representatives, the activities relating to the clearing of title to the Port Arthur property, and the ultimate sale of the property were severable from each other, or formed a part of an integrated whole. Assuming that we found some one or more of these activities severable, we would be confronted with the problem of how long each activity lasted, and how much of the allowed compensation was applicable to each (since the District Court made no allocation of the compensation in this respect). We think that it is not only impossible to determine all of these factors on the record, but that inherently it is impractical, if not impossible, to separate in terms of time and compensation the necessary elements involved. We must, of course, view taxation as a practical problem, and, considering the over-all picture, we think the only practical basis for determining the applicability *vel non* of section 107 (a) to a trustee under a single appointment in reorganization proceedings is to apply the principles we have indicated above.

While petitioner's approach is appealing in the instant case, nevertheless, as we said in *Ralph E. Lum. supra* at 379:

when considering whether this petitioner's services were so "divisible," we may not apply the doctrine of liberal construction in his favor in such a way that some other taxpayer's equally meritorious claim would then require exclusion. In this field, as in many others, one man's meat may be another man's poison * * *

Petitioner relies primarily on two cases, *Chase* v. *Commissioner*, 245 F. 2d 288 (C. A. 9, 1957), reversing *Leslie W. Irving*, 25 T. C. 398 (1955), and *E. A. Terrell*, 14 T. C. 572 (1950). We think the cases are distinguishable. In the *Chase* case, Chase, a lawyer, who was executor of an estate was required to institute suit to preserve the estate. While suit was instituted in his own name, the Court of Appeals in reversing the Tax Court, considered that he was acting in his capacity as a lawyer in so instituting suit and subsequently in aiding Irving, a lawyer hired by Chase to prosecute the suit to completion. Thus, the special compensation granted by the District Court for services performed in connection with the suit were considered by the Court of Appeals to have been awarded for legal

services rendered in a capacity different from that of executor. For this reason the court held that the compensation was separable from that received by Chase as executor. We need only point out that in the instant case, petitioner's services were all rendered in his capacity as trustee.

In *E. A. Terrell, supra* at 575, this Court held that certain services of a president of a corporation, for which special compensation was awarded by the board of directors, constituted "a special task, separate and distinct from all others, and *especially from his regular duties as president and general manager of the corporation.*" (Emphasis supplied.)

Examination of *Estate of Marion B. Pierce*, 24 T. C. 95 (1955), clearly shows that it is distinguishable from the instant case, and we do not deem it necessary here to review the detailed facts.

Petitioner argues that since the District Court divided his services into two separate projects and allowed him separate compensation for each, we are bound by the court's action in the instant case. It is clear from the record that the application of section 107 (a) was not before the court; that the court was acting upon petitioner's application for compensation in the form in which submitted; and that the application was so filed in the effort (successful) of avoiding any contest on the part of George Armstrong, Sr., the dominant stockholder. We need not repeat our analysis, *supra*, of the applicable principles from the perspective of section 107 (a).

*Decision will be entered under Rule 50.*