WALTER L. WOODWARD AND BERNICE A. WOODWARD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3573–66. Filed September 30, 1968.

*Francis J. Butler*, for the petitioners.
*Gary C. Randall*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax of the petitioners in the amounts of $3,296.17 and $325.94 for 1963 and 1964, respectively. Two issues are presented for decision, (1) whether the petitioners may apply section 1301 of the Internal Revenue Code of 1954, as effective in 1963, in computing the tax with respect to certain earnings of Walter L. Woodward received in 1963, and (2) whether respondent erred in the disallowance of certain business expenses claimed as deductions in 1963 and 1964.

### FINDINGS OF FACT

The stipulated facts, together with the exhibits attached to the stipulation, are incorporated by reference.

The petitioners, husband and wife, resided in Spokane, Wash., at the time the petition was filed. They filed joint Federal income tax returns on the cash basis for the calendar years 1963 and 1964 with the district director of internal revenue at Tacoma, Wash.

Walter L. Woodward, herein referred to as the petitioner, is a consulting engineer of more than 20-years experience. He is licensed to practice in Washington, Idaho, Montana, Wyoming, and Oregon.

The Lewiston Orchards Sewer District No. 1 is, and was in February 1956, a legal governmental entity in the State of Idaho. On March 1, 1956, petitioner wrote to the board of directors of such sewer district proposing that he be retained as engineer for the project of designing and supervising construction of a sewer system for the district. In the proposal he stated:

My fee for the entire job would be 7.5% of total construction costs of which my fee for a preliminary is a part. As was suggested in my talk some time ago the figure of $2,500 would about cover this phase with what data is available thru the Irrigation District. This however is deductible from the over all fee if and when the job is completed. I have much of this work done however and adjustments could be made to fit the receipt of either District of Federal planning funds.

Up to 65% less this preliminary figure is due at the completion of Plans and Specifications. The remaining 35% would be due as construction progresses based upon Construction Monthly estimates, for General supervision. This is not to be construed as daily on the job inspection. The inspector is to be paid by you but is reportable and responsible to me. I do not add the usual percentage of from 25 to 100% as he is your employee. Many towns have found it most convenient to have the inspector be the one who is to eventually [sic] be the Superintendent or operator. It does allow a training period and he does know what and why things are done.

On March 6, 1956, the board voted to retain the petitioner for the job. During March 1956 the petitioner and the board entered into a contract providing as follows:

### AGREEMENT FOR PROFESSIONAL SERVICES

1. This Agreement made at Lewiston, Idaho, this _____ day of March 1956, by and between Lewiston Orchards Sewer District No. 1, hereafter called "the District", and Walter L. Woodward, hereafter called "the engineer";

WITNESSETH:

THAT, WHEREAS, the District intends to construct a sewerage system and sewage treatment plant facilities, provided approval is obtained of the bond issue at an election to be held for that purpose.

NOW, THEREFORE, in consideration of these premises and of the mutual covenants herein set forth for the construction of above named improvement as follows:

2. The engineer agrees to furnish and perform the various professional services required for the construction of above named improvement as follows:

a. Preliminary investigations, studies and reports, preliminary general plan or plans, approximate estimate of cost and all necessary conferences with the District.

b. Complete general and detail plans, specifications and detailed estimate of cost.

c. Prepare forms for construction proposals, advertisements, construction contracts and bonds, subject to the approval of the District.

d. Receive and tabulate proposals, report same to the District and assist in awarding contract for construction.

e. Furnish general supervision of the work of the Contractor including line and grade surveys as the construction progresses to assist in a correct interpretation of the plans and specifications and to safeguard the District against defects and deficiencies on the part of the Contractor, but the Engineer does not guarantee the performance of the contract by the Contractor. (The general supervision of the Engineer is to be distinguished from and does not include the resident personal supervision as hereinafter mentioned.)

f. Furnish resident supervision and/or such other surveys or services as may be mutually agreed upon between the District and the Engineer, at the field

payroll actual costs to the Engineer plus field, traveling and "out of office" expense.

g. Furnish property, boundary, right-of-way or other surveys at the actual cost to the Engineer plus field, traveling, and "out of office" expense.

h. Furnish all necessary copies of reports, plans and specifications necessary or needful to the District or Contractor. All original documents, survey notes and tracings are and shall remain the property of the Engineer.

i. Meet with the District, or their representatives when requested or necessary for consultation or conferences.

j. Furnish and perform the supervision of work of inspection bureaus and laboratories in the inspection and tests of materials entering into the construction of structure, receive, and pass upon by approval or rejection all reports by such laboratories or bureaus on the mateial tested for use in the structure. (N.B. The cost of all such tests and inspection by laboratories or bureaus to be paid for by the District.)

k. Furnish and perform the supervision of all test borings, sub-surface explorations or other investigations required for the determining of foundation conditions for the structure. (The cost of such borings, tests, explorations, or investigations to be paid for by the District.)

l. Compute and determine the amount of special assessments if required by the District. The cost of such service to be paid for by the District at actual cost to the Engineer or as by mutual agreement.

m. Prepare necessary plans and applications for permits for the submission to and approval of local, state and Federal authorities (such as municipal building departments, state boards of health, etc.) as may be required for the initiation, prosecution and construction of the improvement. The cost of such permits to be paid by the District but the cost of preparing such plans and applications shall be included in the fee paid the Engineer.

n. To pay for the computations, determinations and tabulations of special assessments as required by the District, except for stenographic work which shall be paid for by the District.

3. The District agrees to pay the Engineer as compensation for such professional engineering services Seven and One-Half (7½%) percent of the entire cost of the construction of the structure, to be paid as follows:

a. Twenty Five Hundred ($2,500.00) Dollars upon the completion of the preliminary investigation studies, preliminary general plan or plans and the approximate estimate of cost, or upon the receipt of the monies obtained from a loan from the Federal Government, application for which has been made, or receipt of sufficient tax monies, whichever shall the sooner occur.

b. Sixty Five (65%) percent, minus, however, the $2,500.00 paid for preliminary work, when working or contract plans and specifications with detailed estimate of cost are completed.

c. Thirty Five (35%) percent payable in monthly installments as construction progresses in proportion to work completed until the aggregate of all payments shall equal the amount due under this agreement.

d. It is mutually understood by the parties hereto that the compensation to the Engineer of 7½% of the entire cost of construction shall cover the entire cost to the District for the professional services of the Engineer to the District. Any additional services ordered or required by the District to be performed by the Engineer shall be upon such terms and conditions as the District and Engineer may agree upon at any regular meeting or at any special meeting called for that purpose.

e. If the proposed bond election for financing the project shall fail to carry and the District should be financially unable to proceed with the project, then the $2,500.00 agreed to be paid for the preliminary survey, as hereinbefore set forth, shall constitute payment in full to the said Engineer and the District shall be relieved from further liability hereunder to the said Engineer, at the time of the next general election of the Board of Directors of said district.

4. It is further mutually agreed by the parties hereto:

a. That the estimated cost shall be used as a basis for monthly, partial or final payments until the actual costs have been established by proposals or by contracts for construction, and

b. That partial payments may be made under Art. 3, paragraphs a and b if requested by the Engineer and approved by the District, and

c. That the cost used as a basis for computation of payments means the cost to the District of the entire construction, including all materials, labor, and use of equipment and without deductions on account of penalties, liquidated damages or other amounts withheld from payments to Contractors but such cost shall not include the Engineer's fee or other payments to the Engineer under this agreement. The "cost of construction" does not include the cost of land, right-of-way or compensation for and/or damages to property unless the agreement so specifies, in which case it is understood that the cost means the cost of the improvement.

d. That the drawings and specifications are instruments of service and as such the original documents, tracings, and field notes are and remain the property of the Engineer whether the work for which they were prepared be executed or not, and shall not be used by the District for any other project or construction. EXCEPT that the results of any test borings shall be the property of the said district.

Petitioner made the preliminary investigation called for in the contract and filed with the board a report dated July 13, 1956. The board approved the report on July 16, 1956.

The report was based upon a present population in the area of some 4,500 persons and an assumed future population of 10,000 within the district and 2,000 possible additions. It estimated a construction cost of $700,000 and added 12 percent for engineer, legal, and contingent expenses, a total of $784,000.

The proposal for a bond issue to finance the projected system was submitted to the voters on November 27, 1956, but was not approved.

On January 3, 1957, petitioner submitted a bill for $2,500 for his services. The board approved the bill on January 24, 1957, for payment. This amount was paid in 1957.

On July 17, 1958, the board requested that petitioner revise his prior report to bring it up to date. Petitioner filed a revised report dated January 19, 1959. The board accepted this on January 20, 1959, and approved his bill for $2,000 for the revision, which amount was paid in 1959. This report estimated the cost of the project at $850,000.

In August 1959 the board voted to revise section 3-b of petitioner's contract to provide for payment, when working plans and specifications were completed, of 65 percent, minus the $4,500 paid for preliminary work.

On September 15, 1959, the sewer bond issue was resubmitted to the voters and again failed to gain approval.

The board considered a possible change of engineers in June 1960, but took no action.

In September 1960 the board voted to have petitioner bring the cost estimates of the sewer system up to date. In October 1960 he met with the board and expressed a desire to continue to serve as engineer. He agreed to bring the cost study up to date without additional fee. He transmitted to the board a revised report under date of October 17, 1961. This estimated a project cost of $1,073,515, and recommended a bond issue of $1,100,000.

In November 1961 the sewer system project was approved by the voters.

In May 1962 the board met with petitioner and approved the plans and specifications he had prepared, subject to certain minor changes. The board agreed to pay petitioner $3,000 as partial payment under the contract. This amount was paid him in May 1962.

Petitioner submitted a bill under date of February 25, 1963, for the plans and specifications, computed in accord with the contract at 65 percent of 7.5 percent of the costs, based upon the then-authorized bond issue of $1,100,000. This was computed at $53,625, from which the previous payments amounting to $7,500 were subtracted, leaving $46,125 as due. This amount was paid him immediately.

During the following months petitioner submitted 13 bills for general supervision of the construction contracts at 35 percent of 7.5 percent of the contract prices based upon the monthly estimates of completion of the work. He was paid $24,939.27 in 1963 and $8,134.42 in 1964 upon these bills. The final bill was submitted under date of May 26, 1964, and was in the amount of $7,624.18, based upon 7.5 percent of the final contract price of $1,257,638.44, less preceding payments. The total amount paid petitioner in 1963 was $71,064.27 and the total paid in 1964 was $15,758.60. The total paid petitioner including the earlier payments in 1957, 1959, and 1962 was $94,322.87.

Petitioners included the amount of $71,064.27 received from the sewer project on their income tax return for 1963 and computed the alternative tax provided for under section 1301 of the Internal Revenue Code of 1954 as effective in that year upon the $46,125 payment received in February 1963. The computation apportioned the $46,125 payment over the period from April 1956 through December 1962 as long-term compensation. Petitioners explained the computation as follows:

On February 26, 1963, the taxpayer received a fee in the amount of $46,125.00 for professional services from Lewiston Orchards Sewer District No. 1, Lewiston, Idaho, for the preparation of Plans and Specifications for a large sewer project. A contract was signed by the taxpayer and the Sewer District on March 19, 1956, for this work. The taxpayer started to render service on this job even

before the contract was signed and continued to render services in connection with this fee through December 1962. Funds were not available for the usual progress payments and were delayed by a legal technicality which required the Court to validate the Bond issue for the project. This was completed late in 1962. During the period from March 19, 1956, through December 1962, token fees were received by the taxpayer on this job in the amount of $4,732.57. Therefore, the 80% provision of Code Section 1301 was met.

On the petitioner's 1963 return a deduction of $1,318.85 was claimed for travel expenses and $1,658.23 for automobile expenses attributable to petitioner's business. Respondent disallowed $1,245 of the travel and $165.82 of the automobile expenses claimed. In 1964 petitioners claimed $1,405 as travel expenses, all of which amount was disallowed by respondent. The amounts deducted are the totals of checks written to cash by petitioner in amounts of $25 or $50.

Petitioner traveled extensively by automobile in these years. A schedule of his trips is as follows:

*1963*

| Months on job | Location | Number of trips | Total mileage round trip |
|---|---|---|---|
| 12 | Lewiston | 40 | 225 |
| 10 | Plummer | 30 | 124 |
| 7 | St. Maries | | |
| 6 | Dayton | 25 | 242 |
| 6 | Grandview | 25 | 386 |
| | | 120 | |

*1964*

| Months on job | Location | Number of trips | Total mileage round trip |
|---|---|---|---|
| 8 | Lewiston | 25 | 225 |
| 11 | Sandpoint | 35 | 160 |
| 10 | St. Maries | 30 | 124 |
| 10 | Dayton | 30 | 242 |
| 6 | Post Falls | 10 | 42 |
| 10 | Whitworth | 25 | 20 |
| | Libby, Mont | 5 | 336 |
| | Wallace | 4 | 166 |
| | | 164 | |

Petitioner maintained no current records of his business expenses incurred or paid in connection with his business travel, nor did he retain receipts or other evidence to corroborate expenses for travel or to show the extent to which they related to his business. The amounts so claimed were his estimates of business expenses. Some of his trips involved overnight stays away from home; others did not.

OPINION

Petitioner, a consulting engineer, in March 1956 entered into a written contract with a sewer district for the performance of "the various professional services required for the construction of" a sewer-

age system and treatment plant facilities. The contract included three phases, (1) preliminary surveys, general plan, and cost estimates prior to voter approval of the project; (2) following voter approval, detailed plans, specifications and cost estimates prior to awarding the construction contract; and (3) supervision of the actual construction. The agreement contemplated a fixed fee for the first phase, any further compensation being dependent upon voter approval of the project. If such approval was secured, petitioner was to be paid for the second phase, a fee of 65 percent of 7.5 percent of the estimated cost, less the amount previously paid for the first phase. After the construction began, he was to be paid for his supervision at the rate of 35 percent of 7.5 percent of the estimated costs. The total fee was to be 7.5 percent of the actual costs.

The project was rejected by the voters in November 1956 and again in September 1959. It was approved in November 1961 after some revisions. The detailed plans and specifications prepared by petitioner were approved by the district board in May 1962. Petitioner was paid the agreed fee for phase two in February 1963, computed at 65 percent of 7.5 percent of $1,100,000, or $53,625, from which all previous payments amounting to $7,500 were subtracted, leaving $46,125 as due.

Construction proceeded during 1963 and 1964, ending in about May 1964. Petitioner supervised the construction. He received $24,939.27 in 1963 for supervising construction. In 1964 he received $15,758.60, of which $8,134.42 was paid upon his bills for supervision and $7,624.18 upon a final billing computed on the final cost of the project.

In the income tax return for 1963 petitioner treated the $46,125 received in that year as a professional fee for services performed under a long-term employment contract subject to the alternative tax provided for under section 1301 [1] of the Internal Revenue Code of 1954 as applicable in that year.

Section 1301 provides for a limitation on the income tax when an individual engages in "an employment" covering a period of 36

---

[1] SEC. 1301. COMPENSATION FROM AN EMPLOYMENT.

   (a) LIMITATION ON TAX.—If an individual or partnership—

      (1) engages in an employment as defined in subsection (b) ; and

      (2) the employment covers a period of 36 months or more (from the beginning to the completion of such employment) ; and

      (3) the gross compensation from the employment received or accrued in the taxable year of the individual or partnership is not less than 80 percent of the total compensation from such employment.

then the tax attributable to any part of the compensation which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.

   (b) DEFINITION OF AN EMPLOYMENT.—For purposes of this section, the term "an employment" means an arrangement or series of arrangements for the performance of personal services by an individual or partnership to effect a particular result, regardless of the number of sources from which compensation therefor is obtained.

months or more and receives not less than 80 percent of the total compensation from such employment in 1 taxable year. The term "an employment" is defined as an arrangement or series of arrangements for the performance of personal services to effect a particular result.

In the income tax return for 1963 petitioner took the position that the $46,125 he received in February 1963 after completion of the detailed plans and specifications of the project was within the terms of section 1301. He had previously received $7,500 for preliminary work under his contract. The amount of $46,125 was more than 80 percent of the total received up to February 1963 and the services covered the period 1956 through 1962, or more than 36 months. The computation made in the return allocated the amount of $46,125 over the period April 1, 1956, through December 1962, when the services were performed.

In the petition a different position is taken. It is alleged that respondent erred in determining that section 1301 was not available to the petitioners in the year 1963. The facts relating to this issue are alleged as follows:

> During the taxable year 1963 Petitioner received the sum of $71,064.27 from the Lewiston Orchards Sewer District No. 1 for engineering services. Petitioner treated the said amount as compensation received under the provisions of Section 1301 of the Internal Revenue Code of 1954 allowing income averaging.
>
> Petitioner worked under an agreement with the Lewiston Orchards Sewer District No. 1 dated March 19, 1956. The agreement was subsequently modified by the parties due to extensive delay in the project.
>
> Compensation received by the Petitioner in the taxable years of 1957, 1959 and 1962 was for work done in completing and revising Preliminary Reports which were separate, distinct and severable from those duties concerned with carrying out the construction of the sewer project for Lewiston Orchards Sewer District No. 1
>
> The Internal Revenue Agent failed to treat the personal service contract as divisable and asserted that 75.34% of the income was received in 1963. Petitioner actually received more than 80% of his total compensation in the taxable year 1963 and should therefore have been afforded the privilege of computing his tax under Section 1301 of the Internal Revenue Code of 1954.

The position taken in the petition is that $71,064.27, the total amount petitioner received in 1963 under the contract, may be treated as income from an employment within the meaning of section 1301. This is more than 80 percent of the $86,822.87 petitioner received in 1963 and 1964. It is less than 80 percent of $94,322.87, the total amount petitioner received under the entire contract. Petitioner would exclude the $7,500 he received prior to 1963.

Respondent contends that in 1963 petitioner did not receive 80 percent of the total compensation for his employment. Respondent's position is that the contract is not severable into parts for the purposes of section 1301, and that, if the compensation paid in 1963 and 1964 may be treated as resulting from an employment severable from the earlier

services paid for before 1963, the later employment did not cover a period of 36 months.

The issue depends upon the meaning of the term "an employment" as used in section 1301.

Section 1301 of the 1954 Code superseded section 107(a) of the 1939 Code and was intended to be more specific in application. In the Senate Committee report (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 445) it was stated:

*Section 1301. Compensation for an employment.*

This section is identical with section 1301 of the House bill. It supersedes section 107(a) of the 1939 Code, and incorporates two major improvements in the provisions of the existing law.

The first of these improvements is the introduction of the term "an employment." The existing law refers simply to "compensations for personal services." The new term "an employment" is a more specific concept and, therefore, more accurately expresses the intended meaning. This aspect of the existing law has been a source of difficulty in determining the particular unit of personal services involved. In order to meet the 36-month requirement there is a tendency to combine various sets of services which in total extend over the required period. Likewise, there is a similar tendency to separate various sets of services in order to meet the requirement that at least 80 percent of the total compensation for all of the services be received or accrued in 1 taxable year. If a taxpayer has already received a substantial payment prior to the taxable year, he may attempt to segregate the prior payment to a different service rendered by him. In order to dispose of these difficulties, this section adopts the term "an employment." The general idea underlying the new term is that the compensation for which tax relief is provided under this section must relate to a particular project on which the taxpayer worked, such as a particular law case, and not to a set of unrelated services which the taxpayer may have performed for the same person.

The applicable regulations (Income Tax Regs., sec. 1.1301a–2(b) (1) (ii) and (iii)), provide:

(ii) Whether an employment exists is a question which must be determined by a consideration of all the facts in each case. The primary factor in making such a determination is what the particular profession, business, or industry would normally consider as a distinct project or result. The statements of the parties and the contracts they make, if any, shall be considered in those cases where the project or result cannot be determined under the preceding sentence.

(iii) To qualify as an employment the services must relate to a particular project, such as a particular law case, and must not consist of a set of unrelated services performed for the same person. Furthermore, the individual steps performed by a taxpayer in connection with his project do not each constitute an employment; the services rendered by the taxpayer with respect to the entire project represent the employment.

The regulations contain an example which petitioner says supports his contention, as follows (sec. 1.1301a–2(b)(2), ex. (3)):

As part of a traffic flow improvement program the City of Z enters into a contract with C, a civil engineer, under which C agrees to perform services in connection with the construction of a highway bypassing the city, a vehicular tunnel

under a river, and an elevated roadway in a congested industrial area of the city. C's compensation for his services with respect to each of these construction projects is fixed in the contract. Since the services performed in connection with each such construction project would normally be viewed by the engineering profession as a distinct project, C's services in connection with each of these construction projects constitute a separate employment. No contractual arrangement between the parties can operate to change the determination of the projects involved. Regardless of its terms, the contract will be viewed as an arrangement for the performance of services to effect three specifically identifiable results. Thus, the arrangement would constitute three distinct employments, even though the contract might provide for a single lump sum payment to be made only upon completion of all three projects.

Under petitioner's contract he agreed to perform "the various professional services required for the construction of the above-named improvement." This improvement was the design and construction of a sewerage system and treatment facility. The petitioner's employment called for services to effect this one particular result, from the preliminary plans to ultimate completion. Petitioner would treat the services performed in preparing detailed plans and in supervising construction as rendered under a different employment than the prior services of preparing estimates and general plans. But there were not two or more employments here. The payments received were all related to the one project.

The example given in the regulations, which petitioner contends is applicable here, is readily distinguishable. The example called for three projects which were deemed severable, since the contract there was to effect three particular results. Here, the contract was *an arrangement for the performance of personal services to effect one particular result*, completion of the sewer system and treatment plant, regardless of the number of steps or phases that might be necessary. There is no warrant for treating the payments petitioner received prior to 1963 as compensation for a different employment than the payments received in 1963 and 1964. As stated in the regulation quoted above, the individual steps do not each constitute an employment. Since the petitioner did not receive at least 80 percent of the total compensation from this employment in 1963, he may not apply section 1301.

Assuming, *arguendo*, that the earlier payments related to an earlier severable employment which was completed when the voters approved the project, and that a second employment then began under which petitioner prepared plans and specifications and supervised construction of the project, section 1301 is inapplicable for a different reason. Under this interpretation, the second employment could not begin until November 1961, when the voters approved the plan. The project was completed before June 1964. Hence, the second employment, if

there was one, did not cover a period of 36 months and section 1301 could not be applicable.

Petitioner argues on brief that the payments for *supervising* construction should be excluded in determining whether the 80 percent requirement of the statute is met. This argument seems to be an alternative to the position taken in the petition and a return to the position taken in the income tax return. The contention is that upon completing the plans and specifications petitioner was entitled to the 65 percent, less prior payments, whether or not he undertook the supervision of construction. The argument, is, as before, to the effect that the contract is severable, but at a different point, at the end of phase two. Whether section 1301 would have been applicable with respect to the $46,125 received in February 1963 if petitioner had not performed the supervisory services need not be decided. The fact remains that petitioner did not in 1963 receive 80 percent of the total compensation under the employment contracted for. The contract was to effect a particular result, construction of a sewerage system and treatment plant facility. This was the sole "employment" within the statute. The services performed prior to supervising construction of the system did not constitute a separate employment within the intent of section 1301.

We hold that petitioner is not entitled to apply section 1301 in computing his income tax for 1963, either with respect to the $46,125 received in February 1963, or the $71,064.27 received in the entire year 1963.

The parties cite no cases, nor have we found any, construing these particular provisions of the 1954 Code. Cases under the prior statute, section 107(a) of the 1939 Code, involve interpretation of different language. However, insofar as relevant, these cases tend to the same conclusion. See, for example, *R. O. Shaffer*, 29 T.C. 187 (1957); *William J. Morrison, Jr.*, 12 T.C. 709 (1949); *Ralph E. Lum*, 12 T.C. 375 (1949); and *Englar's Estate* v. *Commissioner*, 166 F. 2d 540 (C.A. 2, 1948), affirming a Memorandum Opinion of this Court.

Petitioner made a large number of trips to various job locations in the vicinity of Spokane, 120 trips in 1963 and 164 in 1964. He did not maintain records of his travel expenses, but claimed deductions for his estimated expenses. Respondent disallowed most of the amount so claimed for 1963 and all the amount claimed for 1964. Petitioner's estimates were based in part on the amounts of personal checks of $25 or $50 which he cashed and the proceeds of which he says were used for entertainment or gasoline. He maintained no diary or other record of his business travel expenses in these years. Some of the amounts claimed related to meals on trips which did not involve overnight visits. On some, but not all, of these trips he was away from home overnight.

Respondent relies upon section 274(d) of the 1954 Code [2] which requires that the taxpayer substantiate his business expenses by adequate records or corroborating evidence. Petitioner admits that such records or evidence are not available.

The report of the Senate Finance Committee on section 274 (S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 740) points out that unsupported testimony by a taxpayer will no longer be sufficient to establish a business deduction. This report states:

5. *Disallowance of expenditures not substantiated.*—Under the bill, taxpayers will be required to substantiate their entertainment and related expenses, their traveling expenses and gift expenses. The bill provides that the taxpayer must substantiate by adequate records or by other sufficient evidence corroborating his own statement: the amount of such expense or other item; the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift; the business purpose of the expense, and the business relationship to the taxpayer of the person entertained, using the facility, or receiving the gift.

This provision is intended to overrule, with respect to such expenses the so-called *Cohan* rule. In the case of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2d, 1930), it was held that where the evidence indicated that a taxpayer had incurred deductible expenses but their exact amount could not be determined, the court must make "as close an approximation as it can" rather than disallow the deduction entirely. Under your committee's bill, the entertainment, etc., expenses in such a case would be disallowed entirely.

The requirement that the taxpayer's statements be corroborated will insure that no deduction is allowed solely on the basis of his own unsupported, self-serving testimony. However, the degree of corroboration required to support a claimed deduction will vary as respects the business relationship and purpose, the time and place, and the amount of the expense. Thus, oral testimony of the taxpayer together with circumstantial evidence available, may be considered "sufficient evidence" for the purpose of establishing the business purpose required under the new provision. However, oral testimony of the taxpayer plus more specific evidence would be required to be "sufficient evidence" as to the amount of an expense.

This section is effective with respect to the taxable years 1963 and 1964. It imposes a duty upon a taxpayer to make and retain adequate records to substantiate business expenses incurred in travel relating to

---

[2] SEC. 274, DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to any activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.

his business. Petitioner admits that he did not make such records. Respondent did not err in disallowing the travel expenses claimed. See *William F. Sanford*, 50 T.C. 823 (Sept. 9, 1968). Apparently in accord with the policy of leniency in applying this section announced in Rev. Proc. 63–18, 1963–1 C.B. 506, the respondent has allowed a portion of the expenses claimed for 1963, the first year in which this section was effective.

Respondent disallowed 10 percent of the amount claimed by petitioner ($1,658.23) as automobile expense in 1963. No evidence was offered to show error in this disallowance. The respondent's determination is sustained.

*Decision will be entered for the respondent.*